## HOMANS v. NEWTON and others.

*(Circuit Court, D. Massachusetts. December 21, 1880.)*

1. LOGGING PERMIT—BONA FIDE PURCHASER.—A contract between a citizen of New Jersey and a citizen of Maine, called a conditional license, authorizing the grantee to enter upon the lands of the grantor, in the state of New Hampshire, and cut logs therefrom, contained this clause: "Said grantor reserves and maintains full control and ownership of all logs and lumber which shall be cut under this permit, wherever and however situated, until all matters and things appertaining to or connected with this license shall be settled and adjusted, and the sum or sums due, or to become due, for stumpage or otherwise, shall be fully paid." *Held*, that a *bona fide* purchaser of logs cut under this permit could not acquire a better title than the grantee.

2. SAME—TROVER—DAMAGES.—It was further provided that if any default should be made, the grantor should have full power and authority to take all or any part of said lumber, and to sell and dispose of the same at public or private sale, and, after deducting reasonable expenses, commissions, and all sums which were then due, or might become due, for any cause "herein expressed," should pay the balance to the grantees. *Held*, under this clause, that the grantor was not entitled to recover, in trover, of such *bona fide* purchaser, the whole value of the logs sold.

3. SAME—PAYMENT—WAIVER.—A memorandum upon the foot of an account settled between the grantor and grantee, acknowledging the receipt of certain accepted drafts, running from three to eight months, for the sum of the account, contained these words: "which, when paid, will be in full for the above." *Held*, that the acceptances were not taken in payment of the account, and therefore could have no effect as a waiver of the grantor's rights.

Trover.

Tort, in the nature of trover, for the conversion of certain logs, valued at about $14,000. In November, 1875, the plaintiff, a citizen of New Jersey, owning a large tract of land on, or near, the Connecticut river, in New Hampshire, made a contract with Ross & Leavitt, of Bangor, Maine, called a conditional license, by which he granted them permission to enter upon his land and cut logs of certain kinds during the then next logging season, which were to be scaled—that is, measured—by a scaler appointed by the plaintiff, and the agreed stumpage was to be paid for by satisfactory paper, on

a certain credit, and the plaintiff was to make advances when the logs should arrive at the boom, in Hartford. The grantees agreed to conduct the cutting and driving of the logs in a certain way, and with a certain diligence, and to pay damages in case of any default. The contract contained this clause: "And said grantor reserves and maintains full control and ownership of all logs and lumber which shall be cut under this permit, wherever and however situated, until all matters and things appertaining to or connected with this license shall be settled and adjusted, and the sum or sums due, or to become due, for stumpage or otherwise, shall be fully paid;" and, if any default should be made, he should have full power and authority to take all or any part of said lumber, and to sell and dispose of the same at public or private sale, and, after deducting reasonable expenses, commissions, and all sums which were then due, or might become due, for any cause "herein expressed," should pay the balance to the grantees.

Ross & Leavitt were interested as stockholders in a corporation called the Hartford Lumber Company, which owned a mill at Hartford, of which the boom is mentioned in the contract. They cut the timber as agreed, and floated it down the Connecticut river; the first lot arrived at Hartford in August, 1876. In September, 1876, an account was settled between Homans and Ross & Leavitt, showing a debt of $11,248.52 for stumpage, and $10,250 for advances. At the foot, Homans acknowledged the receipt of drafts for the sum of the account drawn by Ross & Leavitt upon, and accepted by, the Hartford Lumber Company, running from three to eight months, "which, when paid, will be in full for the above." These drafts were dishonored, and have not been paid.

The Hartford Lumber Company bought all the logs which reached Hartford, and manufactured and sold a part of them, worth about $12,000, with the knowledge of the plaintiff, before the first acceptance was dishonored. November 22, 1876, the plaintiff took possession of the lumber remaining at the mill, and the company worked it up and sold it for

him under a contract by which they were to have 30 per cent. of the proceeds for sawing, handling, and commissions. They afterwards became bankrupt, and the plaintiff sold one-half the lumber remaining on hand for $4,000, and worked up the other half, for which he received $5,750. They received some other payments from Ross & Leavitt.

The defendants, living in the western part of Massachusetts, bought of Ross & Leavitt certain lots of logs that were being driven down the river in September, October, and November, 1876, and which, of course, never arrived at Hartford. They bought in good faith, without notice of the plaintiff's title, and had made payment of the full price of about $14,000, before he made a demand upon them, March 1, 1877. The plaintiff had no knowledge of the defendants' purchase until November 26, 1876. Between that day and the day of the demand, the defendants had built a mill for sawing the logs, at a cost of about $3,000, and had paid to Ross & Leavitt $621.20. Ross & Leavitt had made sales of other logs in like manner to persons not before the court.

The case was referred.

The referee found the foregoing facts, and submitted the points of law, with his rulings upon them, to the court. He found that the plaintiff retained the property in the logs; that he had not waived his rights; that he was entitled to recover in this action the balance due him from Ross & Leavitt, $3,084.51, and interest at 7 per cent. from the date of the writ, but not the full value of the logs at the time of the conversion; that no deduction was to be made for the cost of the mill, because it appeared to be still worth its cost; nor for the payment of $621.20, unless the whole value of the logs should be the measure of damages, in which case this payment, which was made after the plaintiff knew of the sale to the defendants, should be deducted.

*Caleb Blodgett*, for plaintiff, cited, (of cases not referred to in the opinion of the court:)

On question of property: *Hart* v. *Carpenter*, 24 Conn. 427; *Fifield* v. *Elmer*, 25 Mich. 48; *De Wolf* v. *Babbett*, 4 Mason, 289.

That no demand was necessary: *McCombie* v. *Davies*, 6 East, 540; *Bucklin* v. *Beals*, 38 Vt. 653; *Stanley* v. *Gaylord*, 1 Cush. 536.

There was no waiver or estoppel: *Sargent* v. *Metcalf*, 5 Gray, 306; *Plumer* v. *Lord*, 9 Allen, 455; *Andrews* v. *Lyons*, 11 Allen, 349; *Turner* v. *Coffin*, 12 Allen, 401; *Zuchtman* v. *Roberts*, 109 Mass. 55; *Dezell* v. *Odell*, 3 Hill, 219; *Root* v. *Lord*, 23 Vt. 568.

*Charles Allen*, for defendants.

The vendor cannot claim against an innocent purchaser: *Wait* v. *Green*, 36 N. Y. 556; *Hall* v. *Hinks*, 21 Md. 406; *Vaughn* v. *Hopson*, 10 Bush, 337; *Murch* v. *Wright*, 46 Ill. 487; *Mich. Cent. R. Co.* v. *Phillips*, 60 Ill. 190; 1 Parsons, Cont. 538; 1 Smith, L. C. (7th Am. Ed.) part 2, p. 1203.

By taking the acceptances the plaintiff waived his lien, while they were running, and should be held to have lost it, so far as the defendants are concerned, who stand somewhat like sureties: *Belshaw* v. *Bush*, 11 C. B. 206; *Valpy* v. *Oakeley*, 16 Q. B. 949; *Okie* v. *Spencer*, 2 Whart. 253; *Myers* v. *Welles*, 5 Hill, 463; *Fellows* v. *Prentiss*, 3 Denio, 512; *Appleton* v. *Parker*, 15 Gray. 173; *Green* v. *Fox*, 7 Allen, 85.

A seller on condition must exact performance promptly, or he will be deemed to have waived the condition: *Lees* v. *Richardson*, 2 Hilton, 174; *Bowen* v. *Burk*, 13 Pa. St. 146; *Hennequin* v. *Sands*, 25 Wend. 640; 2 Schouler, Per. Prop. 302; *Upton* v. *Sturbridge Cotton Mills*, 111 Mass. 446; *Haskins* v. *Warren*, 115 Mass. 533; *Freeman* v. *Nichols*, 116 Mass. 309; *Clough* v. *Lond., etc., Ry. Co.* L. R. 7 Ex. 35; *Morrison* v. *Universal Ins. Co.* L. R. 8 Ex. 40.

The measure of damages is not the value of the logs, but the amount of the plaintiff's claim properly reduced by credits, etc.: *Chamberlain* v. *Shaw*, 18 Pick. 278; *Squire* v. *Hollenbeck*, 9 Pick. 551; *Kaley* v. *Shed*, 10 Met. 317; *Perry* v. *Chandler*, 2 Cush. 237; *Briggs* v. *B. & L. R. Co.* 6 Allen, 246; *King* v. *Bangs*, 120 Mass. 514; *Chinery* v. *Vial*, 5 H. & N. 288; *Parish* v. *Wheeler*, 22 N. Y. 494; *Johnson* v. *Stear*, 15 C. B. (N. S.) 330.

LOWELL, C. J. This grant or license or contract purports to give a conditional ownership only to the grantees, of the logs which they should cut under it. The defendants contend that the plaintiff parted with his property, and retained only a lien. This construction is not in accordance with the language of the contract. No doubt his purpose was security, but in attaining it he stipulated that neither the property nor the control of it should pass from him until payment had been made. It was not an ordinary case of sale, but an arrangement covering several undertakings on the part of the grantees, which if they carried out, the property was to be theirs.

The contract is in a form well known in Maine, where the grantees lived, and where standing timber is often sold in this way. Whether the contract was delivered in that state does not appear. It was held in Maine, some 30 years since, that even if the parties to such a contract described the vendor's title as a lien, it was not within the statute concerning chattel mortgages, and need not be recorded; and that the vendor's right was superior to that of a *bona fide* purchaser without notice. *Sawyer* v. *Fisher*, 32 Maine, 28. In most of the cases since that time the grantor's title is spoken of as a lien, though the contracts usually retain "control and ownership," as in the contract now before us. Since those courts respect a lien as fully as they do the general ownership, the name is immaterial there. I suppose that the contract was drawn up in Maine, and I doubt if it would be a wholly unwarrantable inference that the parties intended it to have the effect which the courts of Maine had so often given to similar transactions. See *Emerson* v. *Fisk*, 6 Greenl. 200; *Prentiss* v. *Garland*, 67 Maine, 345; *Crosby* v. *Redman*, 10 Rep. 306; and cases not concerning timber; *Whipple* v. *Kilpatrick*, 19 Maine, 427; *Rawson* v. *Tuel*, 47 Maine, 506; *Bunker* v. *McKenney*, 63 Maine, 529; *Hotchkiss* v. *Hunt*, 49 Maine, 213.

The land was situated in New Hampshire, and as the realty was converted into personalty in that state, it might fairly be contended that the law of New Hampshire must

have been in the minds of the parties. I do not know what their laws would say to a lien not recorded; but, as to a conditional sale and delivery, I understand the law of New Hampshire to agree with that of Maine. The early case of *Sargent* v. *Gile*, 8 N. H. 325, has not been overruled, that I can discover.

It has, however, been held that one who buys chattels in Massachusetts of a vendee whose own title is conditional takes only what the law of Massachusetts would give him, even if at the place where the conditional sale was made the law would have upheld the title of an innocent purchaser. *Hirschorn* v. *Canney*, 98 Mass. 149. That is this case; and, if the law of this commonwealth is to govern, there is no doubt that it prefers the title of the conditional vendor. The decisions which have followed *Coggill* v. *Hartford & N. H. R. Co.* 3 Gray, 545, are so numerous that I have room to cite but a part of them; some of them were more doubtful in respect to the condition, or its waiver, and others were harder for the purchaser than this case. See *Sargent* v. *Metcalf*, 5 Gray, 306; *Burbank* v. *Crooker*, 7 Gray, 158; *Deshon* v. *Bigelow*, 8 Gray, 159; *Zuchtman* v. *Roberts*, 109 Mass. 53; *Benner* v. *Puffer*, 114 Mass. 376; *Salomon* v. *Hathaway*, 126 Mass. 482; *Kenney* v. *Ingalls*, Id. 488.

I have examined the authorities cited for the defendants, and they seem to establish that in a few of the states a conditional sale is put on the footing of an unrecorded mortgage, which, by statute, and not always or usually by the common law, would be invalid against a purchaser. The case cited to that effect from the court of appeals of New York has been overruled by *Ballard* v. *Burgett*, 40 N. Y. 314, and *Austin* v. *Dye*, 46 N. Y. 500; but I assume that some of the cases express the present state of the law in the states whose decisions they are.

No doubt there is hardship when one is enabled by possession of a chattel to commit a fraud; but this is true of all bailments. If I lend a horse to my neighbor, he may be able to deceive an innocent purchaser. The cases are precisely parallel, for one who has agreed for a conditional purchase

has no more apparent possession than a borrower. The common law, as maintained in a great majority of the states, undoubtedly is that in the absence of actual fraud, or laches, on the part of the true owner, the possessor of a chattel, in a case of this kind, can only dispose of his own title. To this only two exceptions are generally admitted—*First*, that a vendor, who has only the right to elect to avoid a sale, must make his election before the title of an innocent purchaser has accrued; *second*, that if the sale is for cash, the vendor may, by making delivery, be held to waive the condition. This last is a question of fact; but where evidence is very strong, a question of fact becomes one of law, by the courts calling it a conclusive presumption. Many points of law are facts so clearly proved that judges will not permit juries to find the contrary. The legal grounds of these exceptions are obvious.

A passage from Kent, 2 Com. 498, which is often cited in favor of *bona fide* purchasers, will be found, on examination, as I conceive, to refer to a rule in equity. The two cases which he cites on that side are from chancery, and he would not have laid down a general rule of title without a much more careful examination of the authorities. See *Copland* v. *Bosquet*, 4 Wash. C. C. 588, where Mr. Justice Washington deals with the first case cited by Kent, and denies that there is such a rule at common law; and the opinion of *Loft*, J., in *Ballard* v. *Burgett*, 40 N. Y. 314, where the commentary and the cases are fully considered. See, too, on the general question, besides the authorities already referred to, Holmes' note to 2 Kent Com. 498, (12th Ed.;) Perkins' note (d) to Benjamin on Sales, § 320, (2d Am. Ed.;) *Clark* v. *Wells*, 45 Vt. 4; *Duncan* v. *Stone*, Id. 118; *Dunbar* v. *Rawles*, 28 Ind. 225; *Griffin* v. *Push*, 44 Mo. 412; *Ridgeway* v. *Kennedy*, 52 Mo. 24; *Bailey* v. *Harris*, 8 Iowa, 331; *Robinson* v. *Chapline*, 9 Iowa, 91; *Baker* v. *Hall*, 15 Iowa, 277; *Sumner* v. *McFarlan*, 15 Kan. 600.

I have omitted many decisions in which the contract contained words to express a bailment, such as lending, or letting to hire with a right to buy, because some courts hold

that such words are necessary to the preservation of the vendor's property. Compare *Rose* v. *Story*, 1 Pa. St. 190; *Becker* v. *Smith*, 59 Pa. St. 469; *Enlow* v. *Kleim*, 79 Pa. St. 488. I do not regard the distinction a sound one, because the transaction itself creates a bailment, and there is no good reason why one set of words rather than another should be used to express the idea that the general property remains in the original owner, provided the idea is adequately expressed.

I conclude, therefore, that Ross & Leavitt did not convey an indefeasible title to the defendants.

The referee finds, as a fact, that the acceptances were not taken in payment of the account, and the memorandum on the account confirms this finding. They can, then, have no effect as a waiver of the plaintiff's rights. The defendants stand no better than the original parties in this respect, because the plaintiff had no knowledge when he took the acceptance that the defendants had any interest in the matter. It was the implication of the contract that all the logs were to be taken to Hartford for manufacture, and the plaintiff was not bound to inquire whether this had been done, and was not likely to suspect that it had not been.

The other defences of waiver and estopped are ruled by the referee against the defendants, on the grounds of fact, that the plaintiff acted throughout with prudence and diligence, and realized as much as he could fairly realize, after a default had been made, and was ignorant of the defendants' equities. He is not accountable for sales made by Ross & Leavitt, or the Hartford Lumber Company before they had made default, and before he had any knowledge of the defendants' position. If a demand was necessary, it was made, and the referee finds that no loss occurred to the defendants by any delay of notice, unless the court adopts a different measure of damages from that which he finds to be the true one.

The plaintiff argues that he is entitled to recover the whole value of the logs sold to the defendants. There are cases in which it is held that no credit can be given for part payment in such cases; that as replevin may be maintained for the

chattels, so their whole value may be recovered in trover. *Angier* v. *Taunton Manuf'g Co.* 1 Gray, 621; *Brown* v. *Haynes,* 52 Maine, 578; *Duncan* v. *Stone,* 45 Vt. 118. The rule is harsh, and there would, perhaps, be a remedy in equity; but, unfortunately, the value of a cow, or of a little furniture, is too slight to bear the expense of such a proceeding.

This case differs from those, in the vital particular that the parties here have agreed on the measure of damages. If the plaintiff took the goods by replevin, he must account for their value after paying his debt; and if he recovered the whole in trover, he must immediately pay the surplus to the defendants. I have little doubt that the contract was thus written, or that the form which was followed was adopted for the very purpose of avoiding the injustice which might follow from an enforcement of the strict rule of the common law. And it is effectual for that purpose.

I find no error in any of the rulings of the referee. I agree with him that the interest on the plaintiff's debt should be reckoned at the stipulated rate of 7 per cent.

Judgment for the plaintiff.